UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     :

UNITED STATES OF AMERICA,

                                     :       05 Cr. 1182 (PAC)

        - against -                             OPINION AND ORDER

                                     :

TIMOTHY MCDARRAH a/k/a
Ps41alum@aol.com,                    :

                         Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

On December 20, 2006, a jury found Timothy McDarrah ("McDarrah") guilty of using a computer, telephone and/or the internet to attempt to entice an individual he believed to be 13 years of age to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Since 18 U.S.C. § 2422(b) is defined as a crime of violence, the Government moved for McDarrah's immediate remand pursuant to 18 U.S.C. § 3143(a)(2). His counsel argued that McDarrah had a meritorious motion, pursuant to F. R. Crim. P. 33, to set aside the jury's verdict and for a new trial. McDarrah claims the Court erred in admitting opinion testimony by FBI Special Agent Austin Berglas ("Berglas") that allegedly addressed McDarrah's intent and belief; and in admitting documents prepared by Berglas that summarized his post-arrest interrogation of McDarrah: Government's Exhibit 3501-B, the official FD-302 report, (the "Report") and Government's Exhibit 3501-C, Berglas's handwritten notes, (the "Notes"). In these circumstances, defense counsel argued it would be unfair to incarcerate McDarrah before his motion was decided.

The Court stayed McDarrah's remand until January 23, 2007 to permit consideration of McDarrah's motion. The Court ruled on January 22, 2007 that a further extension of McDarrah's release on bail was not warranted under 18 U.S.C. § 3145(c) and he voluntarily surrendered on January 23, 2007. This opinion sets forth the Court's reasoning for denying McDarrah's Rule 33 motion.

## BACKGROUND

### I. Summary of the Case

This case arises from an undercover investigation of individuals who use the internet to solicit sex with minors conducted by Agent Berglas, in which he would pose online as a minor or as an adult either engaged in procurement of child prostitutes or child pornography or seeking such services.[1] Agent Berglas's interest in McDarrah stemmed from McDarrah's response to an advertisement posted by Berglas, acting as a pimp named "David Smith," in the "Erotic Services" section of the Craig's List classified website. In recorded telephone conversations with Special Agent Michael McAndrews ("McAndrews"), acting as Smith, McDarrah agreed to pay to have sex with a 14-year-old girl. A meeting was arranged, but McDarrah did not appear.

Subsequently, Smith remonstrated with McDarrah for not appearing and complained about McDarrah's wasting their time. In addition to his guise as "David Smith," Berglas had another identity: "Julie13nyc@aol.com," or "Julie." In this identity, he posed as a 13-year-old girl who had just graduated from 8th Grade and was going to high school in September.

---

[1] Berglas's undercover investigations have resulted in approximately 20 arrests, including a number leading to prosecutions in the Southern District of New York. See, e.g., United States v. Brand, 467 F.3d 179 (2d Cir. 2006); United States v. Gagliardi, No. 05 Cr. 1265, 2006 WL 2597895 (S.D.N.Y. September 8, 2006).

Shortly after the "David Smith" incident, Julie instant messaged[2] McDarrah.  Berglas testified that he sent the IM by accident while IMing with another target of his investigation and monitoring McDarrah's online status.  For the next two months, from July to September, 2005, McDarrah and Berglas, acting as Julie, e-mailed and instant messaged one another.  The correspondence grew increasingly explicit and described a proposed sexual relationship in graphic detail.  The computer-based exchanges were punctuated by telephone calls with McDarrah in which Berglas used a female associate to be the voice of Julie.  McDarrah was ultimately arrested on September 14, 2005 on the corner of Greenwich St. and Chambers St. in Manhattan, just around the corner from the Reade Street address Berglas had given as Julie's.  After his arrest, McDarrah was interrogated by Berglas and Special Agents McAndrews and Sean Watson, and made a number of statements regarding his relationship with Julie.  McDarrah subsequently moved to suppress his post-arrest statements as coerced in violation of his Fifth Amendment rights.  After an evidentiary hearing, the Court found that the statements were made after the appropriate <u>Miranda</u> warnings and were voluntary.  Accordingly, the Court denied the suppression motion.  <u>See</u> <u>United States v. McDarrah,</u> No. 05 Civ. 1182, 2006 WL 2838276 (S.D.N.Y. September 28, 2006).

At trial, the Government presented transcripts of IM conversations and e-mails between Berglas as Julie and McDarrah.  The jury also heard recordings of McDarrah's conversation with a female associate of Berglas, who posed as the voice of Julie.  These transcripts and recordings showed that Berglas consistently held himself out

---

[2] Instant messaging ("IM" or "IMing"), is the exchange of text messages in real-time over the Internet, similar to a text version of a telephone conversation. Instant messaging differs from ordinary e-mail in the immediacy of the message exchange and also makes a continued exchange simpler than sending e-mail back and forth, but requires that both users be "online."  IM programs also often allow users to see which of their "buddies" are online.

to be a 13-year-old girl, and included numerous statements that Julie was 13 by McDarrah himself.  The transcripts and recordings also showed McDarrah suggesting that he and Julie have sex and setting up times for them to meet.  The Government also introduced, under F. R. Evid. 404(b), emails sent by McDarrah in response to other "Erotic Services" advertisements in which he suggested an interest in sexual interaction with minors.  Finally, Berglas and McAndrews testified to McDarrah's post-arrest statements indicating that he believed Julie was a 13-year-old girl, and arguably implying that he intended to have sex with her.

McDarrah presented no evidence, but suggested an alternative theory during opening arguments, used the theory extensively in cross examination, and finally emphasized it in closing arguments.  Defense counsel argued that McDarrah was fantasizing, role-playing, or engaging in "cybersex" in his conversations with Julie.  In a similar vein, defense counsel argued that McDarrah did not believe Julie was actually a 13-year-old girl, speculating that he may have believed her to be a law enforcement official or another role-playing adult.  Defense counsel pointed to questions asked by McDarrah in the IMs and emails and inconsistencies in Julie's statements, and suggested that McDarrah became obsessed with figuring out Julie's true identity.  This obsession, according to defense counsel, led him to become ever more sexually explicit and obscene in an effort to shock Julie into breaking character.[3]  Finally, defense counsel argued that Berglas and McAndrews were misrepresenting or misremembering McDarrah's post-arrest statements.

---

[3] Defense counsel also suggested that this obsession explained McDarrah's presence outside Julie's supposed apartment.

**II. Agent Berglas's Notes and Report**

*A. Trial Testimony*

On direct examination, Agent Berglas testified to his arrest and questioning of McDarrah, and to various statements made by McDarrah in response to that questioning. Trial Transcript ("Tr.") 348-355.  The Government did not ask Berglas about his Notes or Report, nor were they offered in evidence.

The existence of a Report was first raised by defense counsel on cross examination. Tr. 634.  Having previously elicited testimony from Berglas regarding a number of explanations McDarrah had given for his alleged doubts as to Julie's age, Tr. 633-634, defense counsel questioned Berglas about his failure to include McDarrah's explanations in the Report. Tr. 635.  Defense counsel then quoted from the Report that "McDarrah was downtown to meet a 13-year-old girl named 'Julie,' that he met while on the Internet," Tr. 635-636, and established at length that these were not McDarrah's exact words but, as counsel repeatedly phrased it, "your [i.e. Berglas's] words." Tr. 636-638. Defense counsel also elicited the existence of the Notes. Tr. 639.

Cross examination continued into the next trial day.  Defense counsel again returned to the Report, and questioned Berglas as to the statements he had "omitted." Tr. 698.  He also established that McAndrews had been present during the interview of McDarrah, but had not suggested that Berglas add those statements to the Report. Tr. 696-697.  In responding to questions about the Report on cross-examination, Berglas explained the omissions and his characterization of McDarrah's words by stating three times that the Report was a "summary" of the interview. Tr. 638, 698.

On redirect examination, the Government briefly questioned Berglas about the statements made by McDarrah, and then introduced both the Notes and the Report

into evidence over defense objection. Tr. 736-739.  Berglas testified twice more that the

Report and the Notes were summaries of the entire interview, and that he had included

McDarrah's statements that he had believed Julie was a law enforcement official. <u>Id</u>.

On recross examination, defense counsel established again that the Report

was in Berglas's words rather than McDarrah's and that McDarrah had made a number of

statements giving reasons why he did not believe Julie to be a child. Tr. 755-757.

Defense counsel finished his examination by asking whether these statements were

included in the Report or the Notes, at which point the Court sustained an objection to the

question, stating "the documents speak for themselves." Tr. 757-758.

*B. The Admission Ruling*

During a recess immediately following redirect examination, defense

counsel restated his objection to the introduction of the Notes and the Report.  Berglas

testified on direct concerning McDarrah's admissions pursuant to F. R. Evid. 801(d)(2).

After defense counsel's cross examination, which suggested that Berglas recorded only

what he wanted to hear and ignored other important statements, the Government argued

the Notes and Report were admissible under F. R. Evid. 801(d)(1), as consistent with the

declarant's testimony.  Defense counsel objected on the grounds that the motive to

fabricate the Report pre-existed its creation. Tr. 745-746. The Court confirmed its ruling

admitting the Report, stating that "I think it's necessary for the jury to have a complete

understanding." Tr. 746.

*C. Closing Arguments*

   The Government did not refer to either the Report or the Notes during closing argument and rebuttal.[4]  Instead, it emphasized McDarrah's post-arrest statements.  During his closing, defense counsel argued at length that the omission of certain of McDarrah's statements from the Notes and the Report indicated that the jury could not rely on Berglas's testimony, and showed that he "fabricate[d] a confession" and "misl[ed] or lie[d] to a federal jury about the Defendant having confessed."[5] Tr. 927-934. Defense counsel also argued that McAndrews's failure to correct the Report similarly undermined his credibility as a witness. Tr. 937.

*D. Contents of the Notes and Report*

   The Notes and Report, each two pages in length, contain various statements purportedly made by McDarrah that are essentially identical to Berglas's testimony.  The sole portion of the Report that was arguably not included in Berglas's testimony[6] is that McDarrah "was not able to explain why he continued to communicate with 'Julie' if he believed she was an undercover police officer."  Report at 2.  During direct examination, Berglas testified that "When [McDarrah] said he initially thought it

---

[4] Defendant argues that the Government alluded to the Notes and Report during closing arguments, but the cited instances show only references to Defendant's post-arrest statements, as testified to by Berglas, and lists of all the evidence the jury should consider that included "documents."  See, e.g., Tr. 856 ("You look at all the chats, and E-mails and documents that are submitted into evidence what the Defendant's words were at that time.").

[5] Particularly to the point was defense counsel's statement, "[h]ow can you believe a word this man says or a word this man writes in his notes or reports after he has[sic] shown to have prepared such a blatantly misleading report on such an important matter?" Tr. 934.

[6] Defendant asserts that the statement in the Report that "Julie" never told McDarrah she was anything but a 13-year-old girl, see Report at 2, and the statement in the Notes that McDarrah was on the scene of the arrest to meet "what he believed" to be a 13-year-old, see Notes at 1, were also beyond Berglas's testimony.  However, both statements were included in a prior statement by Berglas that defense counsel himself read to the jury.  Tr. 637.  In addition, Berglas repeatedly testified that McDarrah had said that he was at the scene to meet a 13-year-old girl named Julie.  Despite the modest difference in phrasing, the "he believed" language of the Notes did not present different facts to the jury.

was law enforcement, I asked him why did you continue to communicate and why did you show up at the location if you thought it was law enforcement….” Tr. 352-353. Berglas did not state whether Defendant answered his question, and moved on immediately to statements by McDarrah on other subjects, implying unmistakably that McDarrah had no answer for his question and thus presenting the same fact to the jury as was contained in the Report.

### III. Berglas's Opinion Testimony

*A. Direct Examination*

Berglas made five statements on direct examination which the Defendant suggests were inadmissible opinion testimony as to McDarrah's belief and intent. First, when asked why he contacted McDarrah on July 21, 2005, Berglas stated that it was because “…he had made clear that he was interested in having sex with a 13- or 14-year-old girl….And as an FBI agent investigating these types of crimes…I wanted to make sure he was no longer interested in doing it.” Tr. 138-139. Second, when asked what it had meant to him when Defendant wrote “meeting your boyfriend or something,” Berglas stated, “It meant he was asking me if I had a boyfriend.” Tr. 148.

The final three statements involve Berglas's characterizing aspects of McDarrah's IM conversations with Julie as part of a “grooming” process. Following his reading of a portion of the IM conversation transcript in which McDarrah offered to buy Julie lunch when she felt lonely, the Government asked Berglas, “What do you believe the Defendant is doing here?” Tr. 152. Berglas replied that McDarrah was “starting a process we call grooming. He's attempting to befriend this 13-year-old girl, make her feel comfortable with him that he's there for her as a friend.” Id. When asked what he

8

"did understand" McDarrah to be doing in a conversation regarding whether to tell Julie's

mother about them having lunch,  Berglas stated:

> Again, the continuation of the grooming process.  He doesn't want to come right out and say that my name is Tim and I'm 32 years old and I want to have sex with you.  He wants to make sure she trusts him, and by taking her out to lunch…he can make sure that there's some trust, they can meet each other face to face, and another way is it ensures that the Defendant makes sure that Julie is an actual real 13-year-old girl."

Tr. 160-161. Finally, when asked again what did he "understand" about

McDarrah's statement that he was serious about giving Julie sex lessons and

buying her things, Berglas stated:

> Again, it is part of the grooming process. He said that he – he is making it clear that he just wants to gain my trust and – and that he is totally serious about having sex, and teaching me these things, and buying me clothes, CDs, and anything else I wanted."

Tr. 246.

McDarrah objected to all these statements on the basis of F. R. Evid.

704(b).  During a recess, he explained that in testifying that McDarrah's statements were

part of a "grooming process," Berglas was offering an opinion as to McDarrah's belief

that he was dealing with a 13-year-old girl and his intent to entice her to engage in sexual

conduct, thus going to the "ultimate issue in this case." Tr. 198.


*B. Cross Examination*

On cross examination, defense counsel asked Berglas more than 70

questions regarding McDarrah's state of mind.  Certain of these questions were related to

the allegedly improper statements made by Berglas on direct examination. Berglas

answered at least 19 questions as to whether particular portions of the IM conversations

were part of the grooming process, one over Government objection. See Tr. 448, 453,

457, 470, 476, 477, 511, 518, 520, 521, 522, 523, 525, 531, 540, 555, 558.  Before and

after asking the first such question, defense counsel elicited an extended explanation of

what grooming is.  Tr. 447-448.  When asked whether the relevant conversation was

grooming, Berglas responded "based on my experience?"  Defense counsel replied

"[y]es," and Berglas then confirmed that he believed that portion to be part of the

grooming process. Tr. 448.  Defense counsel also asked several questions regarding

McDarrah's state of mind when communicating with "David Smith" which were relevant

to Berglas's statement that he had clearly expressed interest in a 14-year-old girl. <u>See</u> Tr.

401 (was McDarrah "being sarcastic" in asking for a 14-year-old girl), 410 (was

McDarrah "playing with you" when he indicated he would like the girl's mother present

during sex), 412 (was McDarrah "trying to get off the call" with McAndrews regarding a

meeting), 413 ("Did it occur to you at that point that McDarrah had no interest, perhaps,

in meeting").

        Defense counsel persisted in asking additional questions on subjects with

no connection to the allegedly improper direct testimony.[7]  A large number suggested

innocent explanations for McDarrah's conversations with Julie.  Defense counsel asked

nine questions as to whether a portion of the IM transcript was merely McDarrah trying

to get Julie to talk dirty.  <u>See</u> Tr. 442 ("Did you think at that point maybe he was just

trying to get you to talk dirty?"), 445, 458, 460, 500, 501, 529, 530, 557.  Defense

counsel asked five questions as to whether McDarrah was simply engaging in role-

playing or fantasy. <u>See</u> Tr. 433-434 ("Did it occur to you that Mr. McDarrah in his replies

to you" was constructing "two elaborate lies and two elaborate false identities" and

---

[7] A portion of these were pure interpretations of statements in the transcripts, which are dubiously
categorized as opinion testimony about McDarrah's state of mind.  <u>See</u> Tr. 445, 467, 477, 496, 519, 568.

"[t]rying to be as convincing with you as you were trying to be with him"), 534, 554,

558.[8]  Defense counsel also asked if McDarrah had responded to the initial IM from Julie

because he was bored, Tr. 425, and kept making incriminating statements because he felt

that Julie would stop talking to him otherwise, Tr. 446-447, 462, 478 [9], and if certain

comments to Julie were sarcastic or mocking. See Tr. 514, 559.

        Defense counsel also questioned Berglas directly about whether McDarrah

believed Julie was 13. Defense counsel asked whether McDarrah doubted Julie was 13 at

a given time. See Tr. 452 ("Do you think at that point maybe he had a little doubt about

whether you were really a little public school student named Julie who is 13?"), 473, 496,

598, 471 ("You think he's worried…that he may be communicating with a police

officer?").  Defense counsel also asked whether McDarrah thought she definitely was *not*

13. See Tr. 424, 462, 464, 497.  Defense counsel asked whether McDarrah was skeptical

about information Julie had provided concerning the first IM from her, and generally the

connection between David Smith and Julie.  See Tr. 421-423, 430, 432, 440, 441, 462-

464, 481, 505, 515, 528, 586, 605.  On a number of occasions, defense counsel asked

Berglas whether McDarrah's statements were a way of telling Julie he knew she was not

13. See Tr. 456 (McDarrah became sexually explicit after conversation regarding

Stuyvesant conversation because he now knew she was not 13), 471 (McDarrah sent an

article about the arrest of an Internet child enticer to "suggest that he knew you might be

a law enforcement officer"), 484 (saying Julie types almost too fast for a kid "is telling

you at that point he doesn't think you're really a 13-year-old kid?"), 604 ("do you think

---

[8] The Court also sustained an objection to the question "…from Mr. McDarrah's point of view, you also could have been someone role playing as a 13-year-old girl who didn't want to be discovered." Tr. 497-498.
[9] The Court sustained a Government objection to an additional question along these lines. Tr. 549.

he's telling you at that point that he knows very well the connection between David

Smith and Julie13nyc?").

*C. Redirect Examination*

On redirect examination, Berglas testified about McDarrah's motivations

in making certain statements and taking certain actions.  Berglas answered that he did not

think McDarrah was fantasizing when he went to Julie's supposed address. Tr. 730.  He

stated that the reason McDarrah got Julie to talk dirty was to lower her inhibitions about

having sex. Tr. 725.  He stated that McDarrah's questioning of Julie "goes along with the

grooming aspects" as a way to learn about her, her relationship with her parents, the

amount of parental supervision she received, and when she was available to meet him.

See Tr. 717-718. He also stated that McDarrah lied about his age to make himself

younger "so he would be more appealing to Julie as a 13-year-old." Tr. 743.  Finally,

asked "[g]iven your knowledge of the investigation, the instant message communications

and the e-mails prior to this article, do you believe he sent [the article about the arrested

Internet enticer] to build trust with Julie," Berglas said he did, and elaborated that it was

sent to make sure Julie knew to keep what they were doing secret. Tr. 726-727.

In light of defense counsel's questions about fantasizing, on redirect

Berglas testified that in his experience, people fantasizing do not pressure people for their

address; or go to an address multiple times; or say they do not plan to wait until the other

person reaches the age of consent. See Tr. 729-730. When asked if it was common for

people fantasizing to provide their real name, personal history, and current job, Berglas

answered that it was "not my understanding of fantasy." Tr. 733.  Berglas also testified

about the "instruction on how child predators act" and "other experience and training

[that] has enabled you to know how to respond to a child predator's sexually graphic

language." Tr. 718-721.


*D. Closing Argument*

    At closing, the Government made two references to Berglas's allegedly

improper testimony.  First, they argued that

> this defense theory that somehow it is unrealistic to believe 13-year-olds
> would respond to this way [sic] or not or be outraged or upset by the
> Defendant's graphic sexual language just doesn't make sense, especially
> in the context of this case where you heard Agent Berglas explain how the
> Defendant was trying to lower her sexual inhibitions over time.

Tr. 862-863.  Second, after referencing defense counsel's suggestion on cross-

examination that McDarrah sent the article about the other arrested Internet enticer to tell

Julie he knew she was law enforcement, the Government argued that

> [you] heard it from Agent Berglas on the stand, and your common sense
> tells you that this was the Defendant's further attempt to establish a
> relationship of trust with someone he thought was 13 years' [sic] old."

Tr. 867-868.  Defense counsel made three references to similar testimony.  Counsel

argued that Berglas admitted that McDarrah was trying to end the David Smith call from

the very beginning, Tr. 898-899, and read back the portion of the transcript of cross-

examination in which Berglas explained grooming and suggested Defendant had started

doing it. Tr. 905-906.  Most notably, defense counsel argued that Berglas admitted that at

least one time, McDarrah "believed Julie13nyc might not be a real girl and believed

someone was trying to keep him from proving that." Tr. 910.

**IV. Jury Request and Question**

During their deliberations, the jury made one request and asked one question that at least arguably relate to the errors alleged by Defendant.  The request was for the Notes, the Report, and the portions of the direct, cross, and redirect examinations regarding "what was omitted from Berglas's summary." Court Exhibit 3.  The question was, "How would you define believing. Does the defendant have to believe continuously, or can he sometimes have doubt in regards to the 2nd element [of the crime]?" Court Exhibit 5.

## DISCUSSION

### I.  Standard of Review

Under Rule 33, a motion for a new trial may be granted "if the interests of justice so require," Fed. R. Crim. P. 33, and "the burden of proving the need for a new trial lies with the defendant." United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995); see also United States v. Ferguson, 49 F.Supp.2d 321, 323 (S.D.N.Y. 1999) (citing United States v. Soblen, 203 F.Supp. 542 (S.D.N.Y. 1961), aff'd, 301 F.2d 236 (2d Cir. 1962)). The decision to grant a Rule 33 motion is within the broad discretion of the trial court. See United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001); see also Sasso, 59 F.3d at 350; United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  In using its discretion, however, the Court is mindful that motions for a new trial are "not favored and should be granted only with great caution." United States v. Gallego, 191 F.3d 156, 161 (2d Cir. 1999) (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (quoting United States v. Costello, 255 F.2d 876, 879 (2d Cir.1958))).

The standard for reviewing Rule 33 motions based on asserted errors of law has not been specifically stated in the Second Circuit.  Courts in other circuits, however, have adopted some version of the standard that "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." United States v. Wall, 389 F.3d 457, 474 (5th Cir. 2004) (quoting WRIGHT, FEDERAL PRACTICE & PROCEDURE § 556 (3d ed. 2004)).  The Court believes that is the appropriate standard, and will apply it here.[10]  The ultimate test on a Rule 33 motion remains "whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134 (citing Sanchez, 969 F.2d at 1414).


## II. Notes and Report

McDarrah argues that the Notes and the Report were wrongly admitted for their truth as prior consistent statements to rebut an inference of "recent fabrication or improper influence or motive." F. R. Evid. 801(d)(1)(B).  Admittance under Rule 801(d)(1)(B) requires that the prior consistent statements be made before the improper motive arose, which defense contends was not the case here. See Tome v. United States, 513 U.S. 150, 167 (1995); United States v. Forrester, 60 F.3d 52, 64 (2d Cir. 1995). Defendant's argument fails, however, because while the Government unquestionably offered the Notes and the Report under Rule 801(d)(1)(B), that was not the basis on which the Court admitted them.

As the Court stated in its admission ruling, the Notes and Report were admitted to provide the jury "a complete understanding" of their contents.  The Court

---

[10] Notwithstanding the lack of such language in Second Circuit decisions, courts functionally applying that standard have been upheld on appeal.  See, e.g., United States v. Scotti, 47 F.3d 1237 (2d Cir. 1995); United States v. Dunn, 779 F.2d 157 (2d Cir. 1985).

thereby invoked the doctrine of completeness, on which F. R. Evid. 106 is based, rather than Rule 801(d)(1)(B).  Defendant's reliance on <u>Forrester</u> and <u>Unites States v. Check</u>, 582 F.2d 668 (2d Cir. 1978) is accordingly misplaced.  Those cases establish that the Second Circuit will not "consider the admissibility of the evidence for any narrower purpose than that upon which the testimony was unquestionably offered *and received* at trial." <u>Check</u>, 582 F.2d at 683 (emphasis added).  That rule does not apply where, as here, the trial court received the evidence for a different purpose than it was offered in order to help the jury understand the issues in the case.

### A. *The Doctrine of Completeness*

Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106. The Supreme Court has also recognized the continuing vitality of the broader common law doctrine of completeness, on which Rule 106 is based.  <u>See</u> <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 171-172 (1988).  "[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is <u>ipso facto</u> relevant and therefore admissible." <u>Id</u>. at 172.

The Second Circuit has repeatedly held that when a party has made use of a portion of a document, Rule 106 requires the introduction of the entire or a related document when "necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact," <u>United States v. Marin</u>, 669 F.2d 73, 84 (2d Cir.

1982); see also Phoenix Associates III v. Stone, 60 F.3d 95, 101-103 (2d Cir. 1995),

United States v. Rubin, 609 F.2d 51, 63 (2d Cir. 1979), aff'd, 449 U.S. 424, (1981).

Similarly, such documents must be admitted when necessary "to ensure a 'fair and

impartial understanding' of the admitted portion." Marin, 669 F.2d at 84 (quoting United

States v. Capaldo, 402 F.2d 821, 824 (2d Cir. 1968), cert. denied, 394 U.S. 989 (1969).

      Here, the necessity for introducing the Notes and the Report to "avoid

misleading the jury" and to ensure a "fair and impartial understanding" of their contents

was plain.  Defense counsel mounted an all-out assault on Berglas's and McAndrews's

credibility.  Critical components in that attack were the characterization of some of

McDarrah's post-arrest statements in the Notes and Report and the omission of certain

other statements from them.  In the case of Berglas, defense counsel went beyond

claiming a mere lack of credibility and directly accused Berglas of fabricating a

confession.  While the Government had not referred to either document during their

direct examination of Berglas, defense counsel attacked Berglas in an attempt to show

that the characterizations and omissions in the Notes and Report could only be the result

of improper motives.  Defense counsel repeatedly urged Berglas to admit the Report

contained "his words" and not McDarrah's words.   In response, Berglas stated that the

Notes and the Report were his summary of the interrogation, and that this explained both

his use of "his words" rather than McDarrah's, and the omission of certain statements.

      Defense counsel focused on whether the Notes and the Report, taken as a

whole, suggested that Berglas's characterizations and omissions were the result of an

improper motive or active fabrication, rather than the good faith summary of voluntary

statements made after Miranda warnings.  For purposes of resolving this dispute, the

respective descriptions and arguments concerning the Notes and Report proffered by

defense counsel, the Government, and Berglas were all demonstrably inferior to the

documents themselves, and were likely to mislead the jury unless the documents were

available for jury review.  In these circumstances, the Court had no choice but to receive

these documents into evidence.[11]

The Rubin case demonstrates the appropriateness of admitting the

documents.  An Internal Revenue Agent, Thomas Cox ("Cox"), testified to a variety of

admissions made by the Defendant during 12 interviews with government agents. Rubin,

609 F.2d at 57. On cross examination, defense counsel impeached Cox with portions of

the notes of those interviews taken by other agents, which allegedly differed from the

version presented by Cox. Id. at 58.  These notes were not admitted into evidence. Id.  On

redirect, the trial court allowed the Government to introduce into evidence the notes of

four other interviews, again taken by agents other than Cox, which reported admissions

by the defendant that were consistent with Cox's testimony. Id. at 59. Relying on the

completeness doctrine and Rule 106, the Second Circuit upheld the admission of those

notes that addressed supposed inconsistencies raised by the defense on cross-

examination.  Id. at 63.

> "Where substantial parts of a prior statement are used in cross examination of a
> witness, fairness dictates that the balance be received so that the jury will not be
> misled...regardless of whether an improper motive existed at or after the prior
> statement."

Id. (citations omitted).  Notably, the prior statements admitted in Rubin were not those of

the testifying witness.  In light of the attack on the witness, however, the Rubin court

allowed the prior statements in evidence.  Clearly, Rubin controls here where the prior

---

[11] Given the nature of the issue in dispute, it was necessary that the entirety of the Notes and the Report be
admitted, rather than only a portion.

statements (i.e., the Notes and Report) were made by the very person whose credibility and motive had been attacked.

The sole distinction which cuts against application of Rubin is that some, but not all, of defense counsel's use of the Notes and Report related to omissions, rather than the actual content. That, however, is a distinction without a difference. A fact omitted from a document may be just as misleading, when cut free from the context of the document as a whole, as a fact quoted from the document out of context. In either instance, justice requires that the jury be provided with the necessary context for a complete understanding of the document in question.

Completeness required admission of the Notes and the Report, yet it remains the case that Rule 106 "does not compel admission of otherwise inadmissible hearsay evidence," United States Football League v. National Football League, 842 F.2d 1335, 1375-76 (2d Cir. 1988). The Notes and Report were introduced in the context of the dispute, already discussed, over whether the characterizations and omissions they contained indicated that Berglas and McAndrews were not credible. It is for their value in resolving that dispute that they were admitted by the Court. That is a non-hearsay purpose, and the Government's substantive purpose for offering them, expressed out of the hearing of the jury, is irrelevant when the Court stated at the time its alternate grounds for admitting the evidence.


*C. Failure to Give a Limiting Instruction*

When evidence is admissible for one purpose but not admissible for another purpose, "the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." F. R. Evid. 105. Plainly the Court would have been

19

required to provide a limiting instruction to the jury had the Defendant requested one.  No such request was made.

        The text of Rule 105 suggests that it is not error for the Court to fail to provide a limiting instruction in the absence of a request.  <u>See</u> <u>United States v. Rhodes</u>, 62 F.3d 1449, 1453-1454, (holding based on Rule 105 that the trial court did not err by failing to give an instruction limiting testimony to its non-hearsay use in the absence of a request for such an instruction), <u>vacated on other grounds</u>, <u>Rhodes v. United States</u>, 517 U.S. 1164 (1996) (D.C. Cir. 1995).  Even prior to the adoption of Rule 105, a defendant whose objection to the admission of evidence was overruled was required to ask specifically for an instruction confining consideration of the evidence to a limited purpose, in order to preserve that objection.  <u>See</u> <u>United States v. Smith</u>, 283 F.2d 760, 763-764 (2d Cir. 1960).  The lack of a limiting instruction would therefore be reviewed under the plain error standard. <u>See</u> F. R. Crim. P. 51, 52.  In an excess of caution, however, the Court will nonetheless analyze its failure to provide a limiting instruction for harmless error.

### D. Harmless Error Review

        An evidentiary error is harmless if it is "highly probable" that the error did not affect the verdict. <u>United States v. Forrester</u>, 60 F.3d at 64 (2d Cir. 1995). "Reversal is necessary only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  <u>United States v. Dukagjini</u>, 326 F.3d 45, 61-62 (2d Cir. 2003) (citing <u>United States v. Castro</u>, 813 F.2d 571, 577 (2d Cir. 1987)).  The factors relevant to harmless error review are:

(1) the overall strength of the prosecution's case;

(2) the prosecutor's conduct with respect to the improperly admitted evidence;

(3) the importance of the wrongly admitted evidence; and

(4) whether such evidence was cumulative of other properly admitted evidence.

United States v. Garcia, 413 F.3d 201, 217 (2d Cir. 2005).

Application of these factors clearly shows that any error in failing to instruct the jury not to consider the Notes and Report for their truth would have been harmless. As to the first factor, the IMs, emails and recorded telephone conversations by McDarrah with Julie provide a vivid demonstration of what McDarrah was attempting to do. His arrest outside her supposed home was also damning, as were the post-arrest statements to which Berglas properly testified and the emails indicating his interest in sex with minors. Notwithstanding defense counsel's ingenious efforts to provide plausible alternative explanations for McDarrah's conduct, the evidence of McDarrah's guilt is overwhelming.

The Notes and the Report were entirely cumulative of Berlgas's properly admitted testimony.[12] The sole aspect of their contents not directly replicated in the trial testimony was a statement that McDarrah had been unable to explain why he continued to talk to Julie if he thought she was law enforcement. Even that point, however, had been unmistakably implied in Berglas's testimony. Moreover, all the doubts defense counsel raised regarding Berglas's testimony were equally applicable to the Notes and Report, a point defense counsel clearly made both on cross examination and in summation. In light

---

[12] The prosecutors' conduct is not a significant issue here.

of these facts, it is similarly clear that the importance of the Notes and Report for their truth was minimal.

McDarrah cites to United States v. Quinto, 582 F.2d 224 (2d Cir. 1978) and similar cases from other circuits to suggest that as "an official and authoritative" document prepared by the case agent in charge of the investigation, the admission of the Report was prejudicial. That case and the others cited are inapposite. The handwritten Notes and two-page typed Report are a far cry from a memorandum "impressive in appearance" that "relates the entire course of the interview, the questions propounded by the interrogators and [the defendant's] responses to those inquiries." Quinto, 582 F.2d at 235. The documents here are both exceedingly brief and written in summary form. Neither would have had the effect of impressing or influencing the jury by nature of their appearance. See id. Even more importantly, the Notes and the Report were not "a neat condensation of the government's whole case against the defendant" where "[the] government's witnesses in effect accompanied the jury into the jury room." Id. at 236 (quoting United States v. Ware, 247 F.2d 698, 700-01 (7th Cir. 1957). The Notes and the Report did not address the bulk of the evidence against McDarrah: his own undisputed words and actions captured in the tapes and records of his phone and IM conversations and his presence at Julie's supposed home. The Notes and the Report were thus relevant to only a portion of the Government's case, and not the most damning portion at that.

Finally, it should be noted that the jury appears to have clearly understood the purpose for which the documents were offered. At the time the jury requested the Notes and Report, the jury also asked to hear all testimony relating to Berglas's omissions, thereby clearly focusing in on his credibility. As the Notes and the Report, in fact, did not contain all that McDarrah said to Berglas, their presentation to the jury

assured McDarrah's case was considered fairly.  After consideration of all the relevant factors the Court believes that any error in the failure to provide a limiting instruction was harmless.

### III.  Berglas's Opinion Testimony

McDarrah argues that Berglas's opinions about what McDarrah was thinking, doing or intending were inadmissible under F. R. Evid. 704(b).  McDarrah also implicitly relies on the argument that Berglas's testimony was not properly admitted under F. R. Evid. 701.  The reason for McDarrah's reticence in making his reliance on Rule 701 explicit is understandable; that was not the basis of defense counsel's repeated and clearly articulated objections.  The Court will therefore review the admittance of the testimony under Rule 701 only for plain error.  See F. R. Crim. P. 51, 52.

*A. Rule 704(b)*

Rule 704(b) bars an expert witness testifying as to a defendant's mental state from giving his opinion as to whether the defendant possessed the requisite mental state to support an element of the crime charged, stating "such ultimate issues are matters for the trier of fact alone."  F. R. Evid. 704(b).  Defendant argues that Berglas was an expert witness testifying to McDarrah's mental state, and that the five statements to which he objected on direct examination were statements of opinion as to whether McDarrah possessed the requisite belief that Julie was 13 and intent to entice her to engage in sexual activity with him.

The argument fails first because Berglas was not testifying as an expert when he made the allegedly improper statements.  The first two non-grooming statements

were clearly his interpretation of statements made to him by McDarrah, and relied on no particular expertise.  As to the grooming statements, the sole testimony Berglas gave as to the meaning of grooming on direct examination was to call it  "a process we call grooming."  There was no suggestion at that point that grooming had a technical meaning, and Berglas's experience and expertise were not used to justify his characterization of the conversations.  Instead, Berglas gave a more expansive interpretation of McDarrah's statements and used "grooming" as a shorthand term.  None of which suggested any reliance on "specialized knowledge." F. R. Evid. 702.

Similarly, none of Berglas's statements even arguably constituted an opinion that the defendant possessed the requisite mental state to support an element of the crime charged.  Rather, Berglas let McDarrah's own clear statements about Julie's age in the IM transcripts speak for themselves. Berglas did not state on direct examination that McDarrah believed Julie to be 13 years old, and in fact one of his statements explicitly suggested that McDarrah was trying to determine *if* she was 13 years old.  Berglas repeatedly states that McDarrah is trying to gain Julie's trust, but that is manifestly not a mental state that constitutes an element of the crime.  In no sense can Berglas's testimony on direct be said to run afoul of Rule 704(b).

The chief difficulty with McDarrah's argument is that defense counsel was the primary architect of Berglas's testimony to which he now objects.[13]  The Government's redirect was minimal following defense counsel's efforts, and was in any case perfectly admissible to respond to those efforts.

---

[13] The Court gave McDarrah wide latitude to present his case to the jury.  Much of his cross-examination of Berglas was designed to bring out McDarrah's alternative explanations for his conduct.  There is no other explanation for repeatedly asking Berglas to speculate on what McDarrah was thinking.  In light of this examination, defense counsel inverts reality when he argues that he was forced to ask more than 70 such questions to cure the prejudice from five perfectly admissible questions on direct examination.

McDarrah does not cite a single case from this circuit that adopts the expansive view of Rule 704(b) he advocates.  The sole Rule 704(b) case in this circuit to which Defendant points is Unites States v. DiDomenico, 985 F.2d 1159 (2d Cir. 1993). In DiDomenico, a case involving transportation of stolen property, the Second Circuit upheld the trial court's exclusion of testimony by a psychiatrist that the defendant was mentally incapable of knowing the property was stolen. Id. at 1165.  That bears no resemblance to the present matter. All other cases within this Circuit cited by Defendant, including those on which he places the greatest reliance, pointedly invoke rules other than Rule 704(b) as the basis for their decisions.  See Garcia, 413 F.3d at 210-211 (rejecting admission of evidence under Rule 701); United States v. Grinage, 390 F.3d 746, 749-751 (2d Cir. 2004) (same); United States v. Rea, 958 F.2d 1206, 1216-1219 (2d Cir. 1992) (same);  United States v. Dukagjini, 326 F.3d at 54 (rejecting admission of evidence under Rule 702); United States v. Nersesian, 824 F.2d 1294, 1308 (2d Cir. 1987) (upholding admission of evidence under Rule 702); United States v. Brown, 776 F.2d 397, 401 (2d Cir. 1985) (upholding admission of evidence under Rule 702 and explicitly rejecting application of Rule 704(b)); United States v. Awadallah, 401 F.Supp.2d 308, 315 (S.D.N.Y. 2005) (suggesting evidence, if offered, would be rejected under Rule 701).

McDarrah can cite only one case that applies Rule 704(b) in a manner approximating what he argues for here.  See United States v. Watson, 260 F.3d 301, 305-06 (3d Cir. 2001) (rejecting admission of testimony by law enforcement officer regarding whether "the substance contained in Government Exhibit 1 was possessed with the intent to distribute, transfer or deliver versus the intent to personally consume that substance"). Even if the Court agreed that Watson involved testimony comparable to Berglas's, which it certainly does not, it will not adopt a view of Rule 704(b) that the Second Circuit has

repeatedly failed to embrace when presented with the opportunity. The Court therefore finds that the admission of Berglas's testimony did not violate Rule 704(b).

*B. Rule 701*

As noted, the Court will consider any error in admitting Berglas's testimony under direct examination pursuant to Rule 701 for plain error. "To demonstrate plain error, a defendant must show (1) error, (2) that is plain, and (3) that affects substantial rights." <u>United States v. Snype</u>, 441 F.3d 119, 138 (2d Cir. 2006). If those three elements are shown, a reviewing court has discretion to "notice a forfeited error if (4) it 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" <u>Id</u>. (quoting <u>United States v. Vaval</u>, 404 F.3d 144, 151 (2d Cir. 2005).

A witness' opinion or inference testimony is limited to opinions or inferences which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." F. R. Evid. 701. As noted above, Berglas's testimony on direct examination was not based on specialized knowledge and so meets the requirements of Rule 701(c).

McDarrah's arguments based on Rule 701(a) and (b) are closely connected. McDarrah argues that opinion regarding an electronic conversation is not based on a witness' perception, and similarly that Berglas's testimony could not be helpful when the jury was read the transcript of those conversations. In essence, McDarrah contends that physical cues are the sole reason to allow a witness to give his opinion as to the meaning of his interlocutor's statements. The Court disagrees. The jury's perception in listening to months of different conversations read back to back over

26

two days is simply not identical to the perception of a person engaging in a conversation in real time, even if the conversation takes place by e-mail or instant message. Berglas was entitled to say what impressions, as a participant in the conversation, led him to believe McDarrah meant or intended by making certain statements. These impressions were, moreover, likely to be helpful to the jury in understanding the meaning of the conversations.

The cases to which McDarrah cites merely demonstrate the point. In Garcia and Grinage, the court held that Rule 701 did not allow the introduction of opinion testimony as to a "person's culpable role in a charged crime" by an agent relying "on the 'entirety' or 'totality' of information gathered in an investigation." Garcia, 413 F.3d at 212 (quoting Grinage, 390 F.3d at 750-51). Here, Berglas clearly testified based on the content of the particular conversation, and not from the "entirety" of the investigation.

For these reasons, the Court finds the admission of Berglas's opinion testimony on direct examination was not error. Certainly, it does not believe the error was plain, or "clear." See Snype, 441 F.3d at 138. Therefore it is unnecessary to consider the remaining factors.

## CONCLUSION

McDarrah's motion to set aside the jury's verdict and for a new trial is DENIED. The Clerk of the Court is directed to close out this motion.

Dated:  New York, New York
        January 31, 2007

                                    SO ORDERED,

                                    _____
                                    PAUL A. CROTTY
                                    United States District Judge